# United States Court of Appeals
## For the Eighth Circuit

_____

No. 24-3175

_____

United States of America

*Plaintiff - Appellee*

v.

Sharon Rosebear, also known as Sharon Marie Rosebear

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of Minnesota

_____

Submitted: June 11, 2025
Filed: January 27, 2026

_____

Before LOKEN, ERICKSON, and KOBES, Circuit Judges.

_____

KOBES, Circuit Judge.

Seven-year-old J.F. died on December 25, 2022 of malnutrition and an infection caused by severe, untreated head lice. A jury found her grandmother Sharon Rosebear guilty of felony child neglect, in violation of the Major Crimes Act, 18 U.S.C. §§ 1151, 1153(a) and (b), and Minnesota law, Minn. Stat. § 609.378

subd. 1(a)(1). The district court[1] sentenced her to 15 months in prison and two years of supervised release. Rosebear argues that the evidence is insufficient to support her conviction and that her sentence is above the state mandatory maximum sentence in violation of the Major Crimes Act and the rules of *Apprendi* and *Blakely*. We affirm.

## I.

Rosebear and her husband lived in a small house in Ponemah, Minnesota, on the Red Lake Indian Reservation, with their son Derrick's five children. They did not have running water. Free public showers were available at the ambulance station a mile away, at the Boys and Girls club, and at school. Rosebear received food benefits on an EBT debit card and regularly fed the children, but she sometimes traded her EBT benefits at a deep discount for cash.

Rosebear's son Julius and his five children, including J.F., moved into the home in 2021. They slept on mattresses in the living room. Julius was a drug addict and an unreliable parent. Despite regularly feeding Derrick's children and boasting on social media that the grandkids called her "Ma," Rosebear did not feed Julius's children often. She said that "if we made a big meal, we would feed the kids because they'd be standing there looking at us." The school provided free breakfast, lunch, and snacks, and often sent extra sandwiches home with children who needed food. But—because of J.F.'s chronic head lice—neither Rosebear nor Julius sent her to school.

A few weeks before J.F.'s death, the school nurse sent one of J.F.'s siblings by ambulance to the hospital. Medical care and transportation are free on the Red Lake Indian Reservation. The school tried to contact Rosebear about the sibling, who had lice and a related scalp infection. The nurse practitioner cut the child's hair,

---

[1]The Honorable Patrick J. Schiltz, Chief Judge, United States District Court for the District of Minnesota.

administered a topical treatment, prescribed antibiotics, and sent enough lice treatment home to treat anyone else who needed it.

On December 21, 2022, Rosebear complained in a text that she was home alone with the grandchildren. Her husband was staying at the casino, and Julius had "t[aken] off on his kids" the night before and still hadn't come home. The next day she said she was still stuck caring for Julius's children and she planned on charging him $15 per hour. Julius returned at some point after that, and Rosebear took J.F.'s cousins to stay at a hotel on Christmas Eve.

Julius called for an ambulance on Christmas Day, telling the operator that J.F. quit breathing. An EMT found J.F. lying on a mattress. Julius picked up her limp body and handed her to the EMT, who was surprised by her low body weight. Although the EMT administered CPR, she never regained a pulse. Her body was brought to Indian Health Services in Red Lake, Minnesota, for an autopsy.

Rosebear and Julius were charged with crimes related to J.F.'s death.[2] Witnesses during Rosebear's five-day trial included the EMT, an emergency room nurse, the medical examiner, a pediatric infectious disease doctor, J.F.'s cousin, and one of J.F.'s siblings. The Government entered into evidence Rosebear's social media posts and direct messages, a recording of her interview with law enforcement following J.F.'s death, and the autopsy photos showing J.F.'s emaciated body, her matted hair, injured scalp, and the yellow impetigo around her mouth and hairline. Rosebear's defense was that she was not J.F.'s caretaker and so could not be held responsible for neglect. She argued that there were two households under one roof— Julius and his five children as one and Rosebear, her husband, and Derrick's five children as the other.

---

[2]Julius pleaded guilty to felony child neglect resulting in death, 18 U.S.C. §§ 1151, 1153(a) and (b); Minn. Stat. §§ 609.205 subd. 5, 609.378 subd. 1(a)(1), and was sentenced to 60 months in prison and two years of supervised release.

After the jury returned its verdict, the district court denied Rosebear's post-trial motion for judgment of acquittal or for a new trial and imposed a prison sentence, concluding that it was not bound by Minnesota sentencing guidelines.

## II.

Felony child neglect under the Major Crimes Act is "defined and punished in accordance with the laws of the State in which such offense was committed." 18 U.S.C. § 1153(b). Minnesota defines "persons guilty of neglect" to include a "caretaker who willfully deprives a child of necessary food, clothing, shelter, health care, or supervision." Minn. Stat. § 609.378 subd. 1(a)(1). The statute punishes the offense with up to five years in prison "[i]f the deprivation results in substantial harm to the child's physical, mental, or emotional health." *Id.*

## A.

Rosebear argues that the Government failed to prove that she was a "caretaker," because it failed to show that she "voluntarily assent[ed] to childcare responsibilities." But the statute doesn't require an agreement to care for a child. Instead, a "caretaker" is someone who "has assumed responsibility for all or a portion of the care of a child." Minn. Stat. § 609.376 subd. 3. The evidence was sufficient to allow a reasonable jury to find that Rosebear had assumed responsibility for J.F.—especially in the days before her death—even if she didn't want it. *See United States v. Sanchez*, 42 F.4th 970, 974 (8th Cir. 2022) (reviewing sufficiency of the evidence *de novo*). Julius had abandoned his young children, leaving Rosebear the only adult in the home, and she compared herself to being a babysitter who should be paid by the hour because she was "stuck here watching his kids." *See State v. Willis*, No. A12-0606, 2013 WL 1092217, at *7 (Minn. Ct. App. Mar. 18, 2013) (evidence sufficient that child's mother's boyfriend was a "caretaker" because he had assumed responsibility for "a portion of" the care the night of the child's death, even though mother was present and also caring for the child that night).

Rosebear also claims that there was insufficient evidence to show that she "willfully deprive[d]" J.F. of food and healthcare. We disagree. A reasonable jury could find that Rosebear knew that J.F. was starving and needed medical attention, yet willfully and intentionally did nothing, even though she could have. A cousin testified that J.F. ate "the bugs in her hair" and bits of food from a mop and washcloths. The emergency room nurse testified that J.F.'s skin was pale, her body skeletal, and she suffered from the worst case of head lice the nurse had ever seen. The medical examiner testified that J.F.'s scalp and ear had cuts and signs of trauma consistent with repeated scratching, which the infectious disease doctor explained had indicia of infection. The autopsy findings indicated that J.F. was anemic, dehydrated, had pneumonia, and that the invasive Group A streptococcal infection that likely began on her scalp had reached her heart. According to the medical examiner, the lice infestation would have taken weeks or months to develop and J.F.'s weight—only one pound more than she weighed at age 4—showed long-term malnourishment.

In the days leading up to her death, J.F.'s symptoms would not be "consistent with a child that was walking around playing and then collapses and dies." She would have been in pain, fatigued, suffering from fever and chills, and coughing. A witness testified that Rosebear herself said that J.F. "probably died from bugs." There was also evidence that Rosebear cared for other children in the home, sold her EBT benefits for cash, and knew that medical care and transportation were free.

B.

Turning to her sentence, Rosebear argues that it violates the Major Crimes Act's directive that she be "punished in accordance with the laws of the State in which such offense was committed." 18 U.S.C. § 1153(b). She claims state law required the district court to impose the presumptive sentence under Minnesota's mandatory sentencing guidelines regime, which is probation. *See State v. Shattuck*, 704 N.W.2d 131, 141–42 (Minn. 2005). We disagree.

The Major Crimes Act was adopted in 1885, almost a century before the Sentencing Reform Act of 1984 created the U.S. Sentencing Commission and authorized it to create the federal sentencing guidelines. No state had implemented sentencing guidelines until 1981, when Minnesota did. So when considering a burglary conviction under the Major Crimes Act in 1967, we took for granted that "punished in accordance with the laws of the State" meant a term of imprisonment within the range authorized by the state statute. *See Goings v. United States*, 377 F.2d 753, 756 n.1(a) (8th Cir. 1967) ("Although imprisonment for three years on each count seems severe, . . . the fact remains that the sentences are within the maximum authorized by statute."); S.D. Stat. § 13.3703(2) (S.D.C. 1960 Supp.).

In *United States v. Norquay*, we again looked at the state statute for the elements of the offense and for the punishment of "not more than ten years," which we considered the maximum sentence. 905 F.2d 1157, 1159 (8th Cir. 1990) (quoting Minn. Stat. § 609.582 subd. 2(d) (1987)). We addressed the "apparent conflict" between the Sentencing Reform Act's mandate that the defendant "be sentenced in accordance with the provisions of this chapter," 18 U.S.C. § 3551(a), and the Major Crimes Act's requirement that the defendant be "punished in accordance with" state law, 18 U.S.C. § 1153(b). 905 F.2d at 1160. We held "that the Federal Sentencing Guidelines are applicable to convictions under the Major Crimes Act where state law defines the elements of the offense and the punishment, but that the sentence imposed shall not exceed the maximum sentence or fall below any minimum sentence provided by state law." *Id.* at 1163. So again, the state statute—not the state guidelines—set the defendant's sentencing range, even though the state guidelines were mandatory and would have required a higher minimum sentence than the federal range.[3] *See id.* at 1161 (explaining that the Major Crimes Act required "only that the sentence imposed for burglary fall within the minimum, if any, and maximum sentence established by state law"); *see also United States v.*

---

[3]After our decision in *Norquay*, Congress amended the Sentencing Reform Act to clarify that it applied to defendants who had been found guilty of an offense under 18 U.S.C. § 1153. *See* Pub. L. No. 101-647, § 1602, 104 Stat. 4789, 4843 (1990).

*Martinez*, 1 F.4th 788, 790 (10th Cir. 2021) ("Incorporation of state law is limited to the maximum and minimum penalties for the offense and does not extend to state sentencing schemes." (cleaned up) (citation omitted)).

Following these cases, we hold that the Major Crimes Act's directive that felony child neglect be "defined and punished in accordance with the laws of the State" required the district court here to define the elements of the offense and the punishment according to Minnesota's felony child neglect statute, Minn. Stat. § 609.378 subd. 1(a)(1). Because the jury found that Rosebear's willful deprivation caused substantial harm, the statute required punishment of "not more than five years." *Id.* From there, the Sentencing Reform Act required the district court to "sentence[] [Rosebear] in accordance with" federal law and apply the U.S. Sentencing Guidelines. §§ 3551(a), 3553(a)(4). Minnesota's sentencing guidelines do not apply. [4]

---

[4]Both Minnesota's and the United States's guidelines regimes comply with *Apprendi* and *Blakely*, and we reject Rosebear's argument that her "statutory maximum" sentence is Minnesota's presumptive guidelines sentence. *See Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000) (holding that the Sixth Amendment requires that a jury decide any fact that increases a defendant's punishment above what is otherwise legally prescribed); *Blakely v. Washington*, 542 U.S. 296, 303 (2004) (applying *Apprendi* to determinate state sentencing guidelines and holding that the "statutory maximum" is "the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant" (emphasis omitted)). Minnesota's sentencing guidelines are mandatory, so *Apprendi* and *Blakely* require a state sentencing court to impose a sentence within the presumptive guidelines range. *Shattuck*, 704 N.W.2d at 140–42. *Blakely* calls the top of that range the "statutory maximum." *See Blakely*, 542 U.S. at 303. But the U.S. Sentencing Guidelines are advisory, *United States v. Booker*, 543 U.S. 220, 245 (2005), meaning that the "statutory maximum" sentence is set by the statute itself. Rosebear committed a federal offense, § 1153, the federal guidelines apply, § 3551(a), and the Minnesota statute sets the statutory maximum sentence, *see Norquay*, 905 F.2d at 1159.

III.

Affirmed.

_____